**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| ROBERT LYLE, | : | Case No. 3:17-cv-00368 |
| | : | |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.    Introduction

The Social Security Administration has twice denied Plaintiff Robert Lyle's

October 10, 2010 application (protectively filed) for Supplemental Security Income.  He

brings the present case challenging the most recent denial, which is embodied in

Administrative Law Judge (ALJ) Eric Anschuetz's written decision.  ALJ Anschuetz

concluded that Plaintiff was not eligible to receive Supplemental Security Income

because he was not under a disability.  (Doc. #6, *PageID* #s 841-66).

Plaintiff contends that ALJ Anschuetz erred in evaluating the opinions of various

medical authorities, including his treating psychiatrist, an examining psychologist, and

others.  The Commissioner finds no error in ALJ Anschuetz's decision and asks the Court

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

to affirm.

## II.  "Disability" Defined

Plaintiff's eligibility to receive Supplemental Security Income hinged on whether he was under a "disability" as defined by social security law.  *See* 42 U.S.C. § 1381a; *see also Bowen v. City of New York*, 476 U.S. 467, 470 (1986).  Narrowed to its statutory definition, a person is "considered to be disabled … if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).

## III.  Background

Plaintiff asserts that his disabilities began on October 19, 2010, when he was 39 years old.  This age placed him in the category of a younger person under social security law.  20 C.F.R. § 416.963(c).  He did not complete high school.  He worked, at various times, as a plumber's assistant, a commercial cleaner, and a store laborer.

Plaintiff's application for benefits was denied during a first round of administrative proceedings by ALJ Mary F. Withum.  (Doc. #6, *PageID* #s 989-1001).  On appeal to this Court, Plaintiff established that ALJ Withum erred in her assessment of Plaintiff's treating psychiatrist Mahmood Rahman, M.D.'s opinions.  The errors deprived the ALJ's decision of substantial supporting evidence, and the matter was remanded for further administrative proceedings.  *Id*. at 966-80.

On remand, the matter was assigned to ALJ Anschuetz, who held a hearing during

which Plaintiff testified that he started to have "really bad emotional issues…" before 2010. *Id*. at 924. He explained, "I suffer with really severe depression…." *Id*. He understood that he was diagnosed with bipolar disorder, major depressive disorder, and post-traumatic stress disorder. *Id*. Medication did not help him. He felt medication hurt more than it helped. His physical condition caused his depression to get worse. He felt useless because he couldn't do simple things, like play with his children.

Plaintiff told ALJ Anschuetz that sitting for 30 minutes would cause him a lot of pain. He described his pain as "really like arthritic, tightness in my back, and pain. And it's about the same with standing up…." *Id*. at 925. He had spinal-fusion surgery in 2013. Since then, he "had nothing but severe pain issues and very limited maneuverability and mobility with it…." *Id*.

Plaintiff rated his ability to focus as poor. He can't read books or remember what he has read. *Id*. at 941. He has difficulty getting along, including his family. He spent some time in prison for domestic violence. And he seems to acknowledge that his post-traumatic stress disorder is from an assault he suffered in prison. *Id*.

## IV. <u>Medical Evidence</u>

### Mahmood Rahman, M.D

Dr. Rahman examined Plaintiff in May 2009 as part of an initial psychiatric evaluation. Plaintiff reported depression, decreased energy, decreased motivation, irritability, increased stress, hyperactivity, and insomnia. (Doc. #6, *PageID* #707). Dr. Rahman, Plaintiff's treating psychiatrist, completed a Mental Functional Capacity

Assessment in May 2009. He reported that Plaintiff had "marked" limitations in his understanding and memory, sustained concentration and persistence, social interaction, and adaptation. His specific "marked" limitations included his ability to remember locations and work-like procedures; to understand and remember detailed instructions; to carry out detailed instructions; to maintain concentration and attention for extended periods; the ability to perform; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday or workweek without interruption from psychologically based symptoms; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to be aware of normal hazards and take appropriate precautions. *Id*. at 428. Dr. Rahman believed that Plaintiff was unemployable and would remain so for 12 months or more. *Id*.

In November 2009, Dr. Rahman reached the same conclusions he had previously reached about Plaintiff's many marked limitations. He again concluded that Plaintiff was unemployable for 12 months or more. *Id*. at 427. About one year later, Dr. Rahman identified nearly all of the same marked limitations and concluded he was unemployable for 12 months or more. *Id*. at 334.

In December 2010, Dr. Rahman diagnosed Plaintiff with Bipolar Affective Disorder (he used the acronym "BAD"). *Id*. at 380. He reported that Plaintiff was

emotionally labile and agitated, and his thinking disorder was characterized by disorganized thoughts.  He believed that Plaintiff's cognitive functioning was impaired or compromised in many areas—specifically, his ability to maintain attention and concentration; to persist at tasks and complete them in a timely fashion; and to socially interact.  *Id*. at 379-80.  Dr. Rahman noted that Plaintiff would be unable to work with stress.  *Id*.

In May 2011, Dr. Rahman again diagnosed Plaintiff with bipolar affective disorder.  *Id*. at 425.  He observed that Plaintiff's flow of conversation and speech was "pressured," his mood and affect were "labile," and he showed signs of "severe anxiety." *Id*. at 424.  Plaintiff's attention, concentration, and ability to socially interact were impaired or compromised, and Dr. Rahman concluded that Plaintiff was unable to work with stress.  *Id*. at 425.

### Michael W. Firmin, Ph.D.

In February 2011, psychologist Dr. Firmin evaluated Plaintiff at the request of the state agency.  *Id*. at 386-394.  Dr. Firmin noticed that Plaintiff was "very fidgety and nervous."  *Id*. at 386.  Plaintiff told Dr. Firmin that during his teen years, his family relationships were unsupportive, cold and distant, argumentative, and marked by physical fights.  His family had recurrent financial problems.  *Id*. at 388.

Plaintiff received below-average grades, had special tutoring, disliked school, got along poorly with teachers, and experienced discipline problems.  Plaintiff also told Dr. Firmin that he had experienced problems at work about his understanding what the boss

expected, speed of work, supervision difficulties, quality of work, and reprimands. *Id*. at 389. Mental-health issues also impacted his past jobs, causing attendance problems due to depression, going home early due to anxiety or panic, difficulties due to anger or temper, avoiding co-workers to an extreme degree, not being able to control emotions while at work, not getting along with co-workers, and being distracted to the point of affecting his job performance. *Id*.

Dr. Firmin observed that Plaintiff's overall presentation "exhibited mental health symptoms … that seemingly might interfere with work-related activities because of mood, anxiety, attention, distractibility, excessive talking, and lack of focus." *Id*. Dr. Firmin noted that Plaintiff's "manner of dress was messy and his hygiene appeared poor," and his "facial expressions were sad and nervous, and eye contact was shifting." *Id*. Plaintiff's "mood was generally downcast, nervous, and pessimistic, and his affect or emotional responsiveness was judged to be sad." *Id*. He "showed outward manifestations of sighing, fidgeting, picking, shifting, inattention, lack of focus, and excessive talking." *Id*.

Plaintiff informed Dr. Firmin that his anxiety was triggered by stress, including significant life stress in his daily functioning. *Id*. at 389-90. Dr. Firmin wrote, "There were no indications of delusions, compulsions, obsessive thoughts, or phobias. Hallucinations of auditory kinds were noted, including hearing people talking in the backyard…." *Id*. at 390. Plaintiff informed Dr. Firmin that he was taking prescribed medications, including Abilify, Tegretol, Invega, Adderall, Trazadone, and Oxycodone.

Dr. Firmin opined that Plaintiff "presented as an individual who potentially possesses ADHD [attention deficit hyperactivity disorder]." *Id.* at 391. He diagnosed Plaintiff with bipolar II disorder, most recent episode depressed; generalized anxiety disorder; and alcohol, cocaine, and polysubstance dependence in full remission. *Id.*

As to Plaintiff's mental-work abilities, Dr. Firmin concluded that Plaintiff's ability to relate to others—including fellow workers and supervisors—was markedly impaired. *Id.* at 392. Dr. Firmin further found that Plaintiff was moderately impaired in his abilities to understand, remember, and follow instructions for simple, repetitive tasks. He also thought Plaintiff was moderately impaired "relating to maintaining attention, concentration, and persistence [and] pace to perform routine tasks…" *id.*, and moderately impaired in "abilities to withstand stress and pressures associated with day-to-day work activity…." *Id.* at 393 (italics removed).

### Robyn Hoffman, Ph.D. and Karen Terry, Ph.D.

In March 2011, psychologist Dr. Hoffman reviewed the record at the request of the state agency. She opined that Plaintiff was markedly limited in his ability to interact appropriate with the public. *Id.* at 127. Dr. Hoffman also concluded that Plaintiff was either moderately or not significantly limited in the other areas of mental-work functioning. She placed "partial weight" on Dr. Firmin's opinions, and she noted that Plaintiff "is no more than moderately impaired in relating to others." *Id.* at 128. Dr. Hoffman also concluded that Plaintiff could do "a variety of simple, routine tasks. No fast pace or strict quotas. No tasks requiring sustained concentration. [He] is capable of

performing tasks he can accomplish alone.  No frequent changes.  Any changes need [to be] explained and an adequate period of adjustment needed." *Id.*

Three months later, Dr. Terry also concluded that Plaintiff was markedly impaired in his ability to interact appropriately with the general public.  *Id.* at 144.  Dr. Terry also agreed with Dr. Hoffman about Plaintiff's moderate or insignificant limitations.  *Id.* at 144-45.

### Hospitalizations

Plaintiff has a history of emergency-department visits and hospitalizations.  A few examples are representative.

In March 2011, he went the emergency department where a mental-status evaluation revealed his mood was depressed, and his affect was consistent with depression.  His had normal thought process but his insight and judgment were somewhat impaired.  *Id.* at 435.  He was diagnosed with a mood disorder and polysubstance dependency.  *Id.* at 432.

He was hospitalized in December 2011 after he phoned the police and stated that he was feeling suicidal.  He told emergency-room personnel that he came to the hospital "'because of feeling suicidal…," but he also stated, "I'm not but my wife threw away my pain meds.'"  *Id.* at 625.  His wife threw away his medications, *id.* at 626, because they made him like "a zombie."  *Id.* at 625.  Hospital notes indicate that his wife was recently diagnosed with schizophrenia.  A physician "recommended getting his psychiatric medications filled for his long-standing bipolar disorder and ADHD."  *Id.* at 624.

In August 2012, Plaintiff was admitted to a hospital emergency department. His diagnoses consisted of bipolar disorder I, manic with "aggressive ideas in his mind toward self and others"; personality disorder with borderline personality characteristics; and he had financial problems and "[n]oncompliance to treatment." *Id*. at 746. Further notes state that his marital problems were severe and he presented with some suicidality and some homicidality. *Id*.

### Additional Medical Evidence

Plaintiff had an MRI in February 2013 that revealed multilevel degenerative disc disease with disc herniations and various degrees of spinal canal and neural foraminal stenosis, most prominent at L1-L2, L4-L5, and L5-S1. *Id*. at 2169.

In April 2013, Plaintiff underwent a laminectomy and interbody fusion at L4 and L5. *Id*. at 2192-93. Plaintiff subsequently began treatment with Robert F. Linn, D.O. *Id*. at 1509-23. In April 2015, Dr. Linn wrote a brief letter containing his opinion about Plaintiff's inability to work:

> Robert [Lyle] is currently under medical care and is not able to work at this time. It is unknown when and if he will ever be able to resume any gainful employment. [His] current estimated return to work date is August 3, 2015.

*Id*. at 2581.

## V.    ALJ Anschuetz's Decision

As noted previously, it fell to ALJ Anschuetz to evaluate the evidence connected to Plaintiff's application for Supplemental Security Income. He did so by considering each of the five sequential steps set forth in the social security Regulations. *See* 20

C.F.R. § 416.920. His significant findings for present purposes began with his conclusion that Plaintiff had severe impairments—lumbar spine degenerative disc disease; obesity; bipolar disorder; anxiety disorder; and substance abuse disorder—but his impairments did not constitute a disability under the Listings, 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ next found that the most Plaintiff could do despite his impairments, his residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), was light work subject to certain mental and physical limitations. As to mental-work limitations, the ALJ determined that Plaintiff was limited to "performing simple, routine, and repetitive tasks; but not at a production rate pace. He can have occasional interaction with supervisors, coworkers, and the public." (Doc. #6, *PageID* #847). Based on these limitations (and certain physical-work limitations), the ALJ found that Plaintiff could not perform his past relevant work. *Id*. at 864.

In the end, the ALJ concluded that Plaintiff could perform a significant number of jobs available in the national economy and, therefore, he was not under a disability and not eligible for Supplemental Security Income. *Id.* at 865-66.

## VI. <u>Standard of Review</u>

The Administration's denial of Plaintiff's application for benefits is subject to judicial review along two lines: whether ALJ Anschuetz applied the correct legal standards and whether substantial evidence supports his findings. *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec.*, 478

F3d 742, 745-46 (6th Cir. 2007).

Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. Substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, substantial evidence supports the ALJ's factual findings when a "'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

## VII.   Discussion

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the

other substantial evidence in [the] case record."
*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20
C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how
much weight is appropriate, must consider a host of factors, including the length,
frequency, nature, and extent of the treatment relationship; the supportability and
consistency of the physician's conclusions; the specialization of the physician; and any
other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d 541, 544 (6th
Cir. 2004)); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting, in part, 20 C.F.R.
§ 404.1527(d)(2)).

Plaintiff argues that the ALJ erred in evaluating Dr. Firmin's opinions because (1)
Dr. Firmin properly relied on Plaintiff's self-reports, (2) Dr. Firmin's opinion about
Plaintiff's marked limitation in his abilities to relate to others, including coworkers and
supervisors (Doc. #6, *PageID* #391) is well supported by acceptable diagnostic
techniques; and, (3) the ALJ is not allowed to substitute in own lay medical opinion in
place of Dr. Firmin's.

The Commissioner contends that the ALJ properly evaluated Dr. Firmin's
opinions. The Commissioner reasons that the ALJ correctly recognized the shortcoming
of Dr. Firmin's opinion—namely, Dr. Firmin based his opinion (that Plaintiff was
markedly limited in dealing with others) largely on Plaintiff's subjective reports. The
Commissioner further argues that Plaintiff mistakenly relies on observations that Dr.

Firmin did not cite in his analysis, and "Dr. Firmin's entire discussion consisted of Plaintiff's subjective report."  (Doc. #10, *PageID* #2829).

The ALJ placed partial weight on the opinions Dr. Firmin, Dr. Hoffman, and Dr. Terry provided.  The ALJ explained that Dr. Firmin based "the marked limitation in dealing with others largely on the self-reports of [Plaintiff] (Exhibit 7F, page 7), and Drs. Hoffman and Terry apparently adopted this assessment…."  (Doc. #6, *PageID* #863). There are several problems here.

The ALJ inaccurately described Dr. Firmin's report.  The ALJ wrote, "Dr. Firmin acknowledged that he based the marked limitation in dealing with others *largely* on the self-reports of the claimant …."  (Doc. #6, *PageID* #862) (emphasis added).  This is incorrect.  Dr. Firmin said he based his marked-limitation conclusion "*partly* on [Plaintiff's] self-report data as indicated during the interview…."  *Id*. at 391 (emphasis added).  Because Dr. Firmin "partly" relied on Plaintiff's self-reports, substantial evidence fails to support ALJ's conclusion that Dr. Firmin acknowledged he "largely" relied on Plaintiff's self-reports.

The difference here is significant because the fact that Dr. Firmin "partly" relied on Plaintiff's self-reports implies that he had other reasons to find Plaintiff markedly impaired in his ability to deal with others in the workplace.  And indeed he did.  Dr. Firmin wrote that he derived his conclusion about Plaintiff's marked limitation in dealing with others on "interview data."  *Id*. at 392.  Interview data appears in Dr. Firmin's mental-status examination where he observed that Plaintiff's "manner of dress was

messy, hygiene appeared poor…"; his "overall thought processes were characterized by pessimism and distraction, thought preoccupations centered on the presenting problem…"; "during the clinical interview, the claimant's facial expressions were sad and nervous, and eye contact was shifting…."; his "mood was generally downcast, nervous, and pessimistic, and his affect or emotional responsiveness was judged to be sad…."; he "showed outward manifestations of sighing, fidgeting, picking, shifting, inattention, lack of focus, and excessive talking…."; and, "Overall, stability of insight and judgment seemed relatively disrupted & unfocused to the progression required in the clinical interview…." *Id*. at 389-90. These observations fit squarely within the social security Regulation's definition of "psychiatric signs." *See* 20 C.F.R § 416.928(b) ("Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormality of behavior, mood, thought, memory, orientation, development, or perception. They must be shown by medically observable facts that can be medically described and evaluated.").

Case law further confirms the validity of such psychiatric observations in the social-security context. "'[W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.'" *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (citation

omitted); *see Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 526 (6th Cir. 2014) (relying on *Blankenship*); *see also Buck v. Berryhill*, 869 F.3d 1040, 1049 (6th Cir. 2017) (quoting *Blankenship* and stating, "Psychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields. Diagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient. But such is the nature of psychiatry….").

Although the parties have not noticed it, the ALJ found that Plaintiff had a moderate impairment in his ability to deal with others based on the reasons he discussed earlier in his Decision ("Finding Number 3 above"). (Doc. #6, *PageID* #862). Close examination of the record reveals that substantial evidence fails to support those reasons. At step three of the sequential evaluation, the ALJ found that Plaintiff had moderate limitations in part because "he said he helps watch and supervise his children (Exhibit 11E)…." *Id.* at 846. The ALJ's citation to Exhibit 11E (*PageID* #312) is to a form Plaintiff completed in support of his application for benefits. Plaintiff indicated in this form that he did *not* take care of anyone else, including children. *Id.* He wrote that he had a hard time taking care of his children, and he noted that had once been able to care for his children but could no longer. *Id.* at 312. The ALJ also ignored Plaintiff's statements elsewhere in this form that tend to support the conclusion that he was markedly limited in his social functioning. When asked about his ability to socialize, he acknowledged that he had problems getting along with family and neighbors. He explained, "Family and neighbors make fun of me." *Id.* at 314. He also indicated that he

never spent time with others, never went places on a regular basis, no longer went anywhere, and had "no social life." *Id.* It was error for the ALJ to misconstrue Plaintiff's statements about caring for his children while ignoring other information he provided in the same form that tended to confirm he was markedly impaired in social functioning. *See Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) ("[A] substantiality of evidence evaluation does not permit a selective reading of the record."); *see also Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position.")

Turning to Dr. Rahman, the ALJ placed little weight on his assessment "because it is unsupported by objective medical evidence, both in [his] own treatment notes and in the preponderance of the record." (Doc. #6, *PageID* #863). The weight to be accorded a treating psychiatrist's assessment does not hinge on the existence of objective evidence. Instead, and again, it is the psychiatric signs documented in the record that matter. *See* 20 C.F.R § 416.928(b). Such signs appear in Dr. Rahman's report where he notes that he observed that Plaintiff's flow of conversation and speech was "pressured," his mood and affect were "labile," and he showed signs of "severe anxiety." *Id.* at 424-25. These observations by Dr. Rahman—a professional trained in the field of psychopathology— support his opinions that Plaintiff had many marked limitations in his mental-work

abilities. Dr. Rahman's opinions are also in line with Dr. Firmin's findings that

Plaintiff's limitations on his ability abilities to relate to others—including fellow workers

and supervisors—is markedly impaired. *Id*. at 391. Moreover, Dr. Firmin's observation

that Plaintiff Lyle "showed outward manifestations of sighing, fidgeting, picking,

shifting, inattention, lack of focus, and excessive talking" and that his anxiety is triggered

by stress is consistent with Dr. Rahman's opinion that Plaintiff is unable to work with

any stress and with his observations that Plaintiff's flow of conversation and speech was

"pressured," his mood and affect "labile," and that he showed signs of "severe anxiety."

*Id*. at 386, 389-90, 424-25. This Court, moreover, previously explained, "Here, Dr.

Rahman, a psychiatrist, observed that Plaintiff was 'agitated'; had 'rapid' and 'pressured'

flow of conversation; showed signs of 'severe anxiety'; had a 'labile' mood and affect;

and had decreased energy and motivation. These findings are based on Dr. Rahman's

personal observations, not Plaintiff's subjective complaints." *Id*. at 976-77 (citing 390,

435, 718).

The ALJ also placed little weight on Dr. Rahman's opinion because it is "out of

proportion with the other medical records…. [H]e has relatively intermittent treatment

since the alleged disability onset date, and since stopping treatment with Dr. Rahman in

April 2012…." *Id*. at 863. As cogently explained in *Sarp v. Comm'r of Soc. Sec.*, No.

16cv10099, 2017 WL 1365414, at *8 (E.D. Mich. 2017):

> [P]enalizing an individual suffering from mental impairments
> like bipolar disorder for failing to seek treatment or take
> medication is "a questionable practice." *Blankenship v.
> Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989). *See Kellett v.*

> *Colvin*, No. 13-CV-12884, 2015 WL 181650, at *15 (E.D.
> Mich. Jan. 14, 2015) ("[P]laintiffs suffering from mental
> impairments, particularly bipolar disorder, should not be
> penalized for failure to seek psychiatric treatment."), *adopted
> by* 2015 WL 181650 (E.D. Mich. Jan 14, 2015); *McDonough
> v. Comm'r of Soc. Sec.*, No. 15-CV-11916, 2016 WL
> 8115404, at *6 (E.D. Mich. Aug. 18, 2016), *adopted by*, No.
> 15-11916, 2016 WL 5402936 (E.D. Mich. Sept. 26, 2016)
> (same). *See also Kangail v. Barnhart*, 454 F.3d 627, 630 (7th
> Cir. 2006) (explaining that bipolar disorder "may prevent the
> sufferer from taking her prescribed medicines or otherwise
> submitting to treatment.").

In addition, other than Dr. Firmin and Dr. Rahman, no treating or examining

source provided a mental functional-capacity assessment of Plaintiff. This leaves the

record without a treating or examining source's opinion disagreeing with Dr. Firmin's or

Dr. Rahman's. And the record-reviewing psychologists—Drs. Hoffman and Terry—

concluded that Plaintiff had marked limitations in his ability to interact appropriately with

the general public. This tends to substantiate Dr. Firmin's and Rahman's opinions about

Plaintiff's marked mental-work limitations.

There is one more feature of the ALJ's decision that is concerning. The ALJ

described many of Plaintiff's emergency-room visits and hospitalizations for mental-

health issues as part of his assessment of Plaintiff's credibility. This by itself was not

error because the Commissioner instructs ALJs to consider the facts of each case under

the Regulations and applicable Ruling and to not presume that all claimants with a

substance addiction disorder are inherently less credible than other claimants. *See* Soc.

Sec. R. 13-2P, 2013 WL 621536, *13 (Feb. 20, 2013). Ruling 13-2P continues, "In

addition, adjudicators *must* consider a claimant's co-occurring mental disorder(s) when

they evaluate the credibility of the claimant's allegations." *Id*. (italics added). The concern crops up here: The ALJ did not consider, in any meaningful way, what impact Plaintiff's bipolar disorder combined with his substance addiction disorder had on his credibility. The ALJ should have considered this for three reasons. First, "bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her [or his] symptoms." *Kangail*, 454 F.3d at 629 (citing, in part, Frederick K. Goodwin & Kay Redfield Jamison, *Manic–Depressive Illness* 219-25 (1990); Li–Tzy Wu et al., "Influence of Comorbid Alcohol and Psychiatric Disorders on Utilization of Mental Health Services in the National Comorbidity Survey," 156 *Am. J. Psychiatry* 1235 (1999) (other citations omitted). Second, Plaintiff's many emergency-room visits and hospitalizations for suicidal ideation, detailed by the ALJ, *see* Doc. #6, *PageID* #s 855-58, should have alerted the ALJ to consider whether bipolar disorder precipitated Plaintiff's substance abuse. Instead, the ALJ overly focused on what he saw as dishonesty in Plaintiff's drug abuse, non-compliance with treatment, and possible drug-seeking conduct. *Cf*. Ruling 13-2P, 2013 WL 621536, *13 ("adjudicators must consider a claimant's co-occurring mental disorder(s) when they evaluate the credibility of the claimant's allegations."). Third, Plaintiff's attorney alerted the ALJ to the possibility that drug abuse was not causing Plaintiff's mental-health problems. He argued that drug abuse was "unfortunately making it a lot harder for him and he's been his own worst enemy, but he's got psychological problems whether he's using or not. When he's completely clean…, he's still suicidal …." *Id*. at 945.

There remains the possibility that the ALJ's errors were harmless. Yet, because the Commissioner does not raise harmless error, the record lacks any present controversy over Plaintiff's contention that the ALJ's errors were not harmless given that the vocational expert testified during the ALJ's hearing that there would be no jobs at any exertional level available to a hypothetical person (1) who is limited to working in isolation would be unable to sustain light work, and (2) who, due to psychological distress, would be off-task one-third of the workday, or absent from work three times per month. *Id*. at 954-55.

Accordingly, Plaintiff's Statement of Errors is well taken.[2]

## VIII.  Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own Regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746.  Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see*

---

[2] Because of this conclusion and the resulting need to remand this case, an in-depth analysis of Plaintiff's remaining challenge to the ALJ's decision is unwarranted.

*Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for Supplemental Security Income should be granted.

The ALJ should likewise be directed to consider whether Plaintiff's borderline personality disorder precipitated his substance addiction disorder; and if so, whether

Plaintiff is disabled considering all his medically determinable impairments including, but not limited, to his bipolar disorder, anxiety disorder, and substance addiction disorder; and if so, whether Plaintiff would continue to be disabled if he stopped using drugs and alcohol. *See* Ruling 13-2P, 2013 WL 621536, *2 ("When … we determine that a claimant is disabled considering all of the claimant's medically determinable impairments…, we must then determine whether the claimant would continue to be disabled if he or she stopped using drugs or alcohol…."); *see also* 42 U.S.C. § 1382c(a)(3)(J); 20 C.F.R. § 416.935.

### IT IS THEREFORE RECOMMENDED THAT:

1.  The Commissioner's non-disability finding be vacated;

2.  No finding be made as to whether Plaintiff Robert Lyle was under a "disability" within the meaning of the Social Security Act;

3.  This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.  The case be terminated on the docket of this Court.

May 8, 2019

*s/Sharon L. Ovington*
Sharon L. Ovington
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).